ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLES P. BLEDSOE, | § | **3-09CV0734-L** |
| | § | |
| Plaintiff, | § | Civil Action No. _____ |
| | § | |
| v. | § | 30611 |
| | § | |
| REMINGTON ARMS COMPANY, INC., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff, Charles P. Bledsoe, complaining of Remington Arms Company, Inc., Defendant, and for his cause of action would show the Court and the jury the following:

I.

## JURISDICTION AND VENUE

1.      The jurisdiction of this Court attaches under the provisions of 28 U.S.C. §1332, in that the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000, and the parties are citizens of different states.

2.      Jurisdiction in this case is founded on diversity of citizenship, and venue is proper in the Northern District of Texas under 28 U.S.C. §1391(a) and (c). Here, there is only one Defendant, so all defendants reside in the same state. 28 U.S.C. § 1391(a)(1). Further, for purposes of the federal venue statute, Remington is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. § 1391(c). Remington currently sells its firearms products throughout the Northern Judicial District of Texas. Thus, Remington's contacts with the Northern District of Texas are continuous and systematic. Venue

PLAINTIFF'S ORIGINAL COMPLAINT                                                              PAGE 1

is proper in the Northern Judicial District of Texas.

II.

PARTIES

3.      Plaintiff Charles Phillip Bledsoe is a citizen of the State of Georgia and resides in

Americus, Georgia.

4.      Defendant Remington Arms Company, Inc. (hereinafter "Remington") is a corporation

foreign to the State of Texas being organized and incorporated under the laws of the State of

Delaware and having its principal place of business in North Carolina. At all times relevant to

this action, Remington was doing business in the State of Texas by selling, manufacturing and

distributing rifles through its distributors and sales force.  Service of process will be

accomplished privately or waived under Federal Rule of Civil Procedure 4.  The Texas

Comptroller reports the following information regarding Remington Arms Company, Inc.:

| | |
|---|---|
| Entity Information: | **REMINGTON ARMS COMPANY INC**<br>PO BOX 700<br>MADISON, NC 27025-0700 |
| Status: | **IN GOOD STANDING NOT FOR**<br>**DISSOLUTION OR WITHDRAWAL**<br>**through May 15, 2009** |
| Registered Agent: | C T CORPORATION SYSTEM<br>350 N. ST. PAUL ST.<br>DALLAS, TX 75201 |
| State of Formation: | DE |
| File Number: | 0009787306 |
| SOS Registration Date: | November 22, 1993 |
| Taxpayer Number: | 15103509350 |

III.

FACTUAL BACKGROUND

5.      On December 29, 2006, Plaintiff released the safety on his Remington Model 710 rifle.

He did not pull or in any way touch or engage the trigger.  Upon safety release, the rifle fired,

shooting Plaintiff in the foot.  The gunshot caused serious medical injuries, and Plaintiff, then a

United States Marine (he was off duty at the time of the incident in question) was ultimately

discharged honorably from the Marines resulting from his disabling injuries.

6.      Remington is now engaged in the business of designing, manufacturing, assembling,

distributing and selling firearms, and in this regard did design, manufacture, distribute, sell, and

place into the stream of commerce the Remington Model 710 bolt action rifle including the

action, fire control system, and safety (hereinafter "rifle"), knowing and expecting that the rifle

would be used by consumers and around members of the general public.

7.      The Remington Model 710 bolt action rifle contains a dangerously defective "Walker"

fire control system that may (and often does) fire without a trigger pull upon release of the

safety, movement of the bolt, or when jarred or bumped.

8.      Remington continues in the design, manufacture, distribution and sale of its product lines,

including the Remington Model 710 bolt-action rifle (the rifle is now known as the Model 770).

Remington has designed a new trigger mechanism that is safe, but it only installs the new

mechanism into some of its rifles.

9.      Plaintiff brings this action to recover damages from Defendant arising from Charles

Bledsoe's personal injuries caused by this incident.  Plaintiff's damages include past and future

medical and related expenses, mental and physical pain and suffering, loss of earnings, impaired

earning capacity, permanent disability, disfigurement and other general and special damages in

an amount to be determined by the jury at the trial of this action.

IV.

## COUNT I:  STRICT LIABILITY

10.     Defendant is strictly liable to Plaintiff for designing, manufacturing, and placing into the stream of commerce the Remington Model 710 bolt action rifle, which was unreasonably dangerous for its reasonably foreseeable uses because of the following design defects, which were a producing cause of the occurrence in question:  The rifle in question has a propensity to unexpectedly discharge without pulling the trigger.

11.     The Remington Model 710 bolt-action rifle was in a defective and unreasonably dangerous condition because of Remington's failure to warn of the rifle's propensity to unexpectedly discharge without pulling the trigger.

12.     Plaintiff had no knowledge of this defective condition and had no reason to suspect his rifle was unreasonably dangerous prior to the inadvertent discharge.

13.     As a direct result of Remington's failure to warn of the 710 rifle's propensity to unexpectedly discharge without pulling the trigger, Plaintiff has been injured and is entitled to recover the damages from Remington.

V.

## COUNT II: NEGLIGENCE

14.     Defendant was negligent in the design, manufacture and marketing of the product in question.  Defendant knew, or in the exercise of ordinary care should have known, that the Remington Model 710 rifle was defective and unreasonably dangerous to those persons likely to use the product for the purpose and in the manner it was intended to be used.  Defendant was negligent as set forth in this and the preceding paragraph, and Defendant's negligence was a

proximate cause of the occurrence in question.

15.     Defendant knew, or in the exercise of ordinary care should have known, of the means of equipping the rifle with an adequate fire control system, thereby preventing injury to Charles Bledsoe.  Defendant had actual knowledge of the means of designing such a product, which would not fail in one or more of these ways.  Notwithstanding this knowledge, Defendant failed to equip the product in question with an adequate fire control system to prevent the injuries to Charles Bledsoe.

16.     Defendant knew, or in the exercise of ordinary care should have known, of problems with its Model 710 rifle and its other rifles but failed to notify or warn owners or the general public prior to or after Charles Bledsoe's injuries.

17.     Defendant owed Plaintiff the duty of reasonable care when it designed, manufactured, and marketed the product in question.  Defendant violated its duty and was negligent as set forth above.

18.     Each of the above-mentioned acts or omissions was a proximate cause of the injuries and damages to Plaintiff.

VI.

COUNT III:  EXEMPLARY OR PUNATIVE DAMAGES

19.     Defendant Remington's actions, when viewed objectively from the standpoint of the actor at the time of the occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Remington's consumers and the general public, including Charles Bledsoe.  Remington had (and has) actual, subjective awareness of the risk involved in utilizing a fire control mechanism for the 710 rifle derived from the Walker fire control mechanism but nevertheless proceeded with conscious indifference to the rights, safety,

and welfare of others.  Exemplary damages should be assessed against Remington to deter it and others from disregarding the rights, safety and welfare of the general public.

20.      Despite a defect that has been known to Remington for decades—a defect resulting in over 4,000 documented complaints of unintended discharge, many jury verdicts finding that the design is defective (including at least 2 findings of gross negligence), and more than $20 million in settlements paid to injured consumers since 1993—millions of unsuspecting users hunt today with a rifle that will fire absent a trigger pull.

21.      Remington redesigned its fire control mechanism, but perceived financial ruin prevents Remington from recalling millions of rifles it knows are defective.  This "profits over people" or "profits over safety" mentality is exactly the conduct that exemplary damages are designed to prevent.

22.      Over 100 injured individuals have sued or made claims against Remington over the same defective design, and several juries, including at least two federal court juries, have found Remington's fire control to be defective.

23.      As early as January 25, 1990, an internal Remington memo reveals:  "The number of Model 700 rifles being returned to the factory because of alleged accidental firing malfunctions is constantly increasing.  170 were returned to Product Service for examination in 1989 with various accidental firing complaints.  To date this year, 29 have been returned."  Ignoring thousands of customer complaints, however, Remington refuses to recall its rifles or warn its customers.

24.      Remington's Model 710, which uses the old fire control, was introduced in 2001.  Even though the 710 has only been on the market for about eight years, Remington has already received hundreds of complaints of unintended discharge, mirroring the complaint history of the

Model 700.

25.     Remington's defective trigger mechanism uses an internal component called a "connector"—a design component not used by any other rifle manufacturer. The connector floats on top of the trigger body inside of the gun, but is not physically bound to the trigger in any way other than spring tension.  The connector cannot be seen or controlled by the gun handler. When the trigger is pulled, the connector is pushed forward by the trigger, allowing the sear to fall and the rifle to fire.

26.     The proper position of the connector under the sear requires an overlap—or "engagement"—of only approximately 25/1000ths of an inch (half the width of a dime or eight human hairs).  But because the connector is not bound to the trigger, during the recoil action after each firing of the rifle, the connector separates from the trigger body several times and creates a gap between the two parts.  This separation is recorded in Remington's own high-speed video footage of the fire control during discharge.  Any dirt, debris or manufacturing scrap can then become lodged in the space created between the connector and the trigger, preventing the connector from returning to its original position.

27.     Remington's own experts have admitted the existence of this dangerous condition:

> Q.     From a performance standpoint, the trigger connector, by the time the Model 710 was introduced, did nothing to truly enhance performance.
>
> A.     I think that's true.
>
> Q.     Are there any circumstances, in your judgment or experience, depending upon, you know, again, what other factors may be at play, where the trigger connector does increase the risks or the safety concerns with use of the Walker fire-control system?
>
> A.     It theoretically adds one more point at which you could put in debris and prevent the connector from returning underneath the sear, and that is between the trigger and the connector.

Q.     Let me see if I understand what you just said. On a theoretical level, the trigger connector does present a moving part that under certain circumstances could result in debris getting between the trigger connector and the trigger body, correct?

A.     Right.

Deposition of Remington liability expert Seth Bredbury, *Williams v. Remington*.

28.     When enough displacement occurs, the connector will no longer support the sear (either no engagement is present, or insufficient engagement is present) and the rifle will fire without the trigger being pulled.  This can occur in a variety of ways including when the safety is released, when the bolt is closed, or when the bolt is opened.  These unintended discharges occur so frequently that Remington actually created acronyms for internal use (Fire on Safe Release—"FSR"; Fire on Bolt Closure—"FBC"; Fire on Bolt Opening—"FBO"; and Jar Off—"JO").  The various manifestations notwithstanding, all of the unintended discharges result from the same defective condition—the susceptibility of the connector to be displaced from its proper position.  Even Phil Haskell, who designed the fire control along with Merle Walker (both Walker and Haskell's names appears on the patent), wrote in 1992:  "I also think now that the housing of the [fire control] parts is all wrong.  There is too much opportunity for small debris, foreign material to become trapped within that housing and then change the 'fit' or clearances of the internal parts."

29.     When questioned about this susceptibility shown in Remington's own high-speed video footage, Remington engineer Michael Keeney offered the following:

Q.     In those frames, does the connector appear to be separated from the trigger body?

A.     Yes.

Q.     And if debris is inside the housing, that would provide an opportunity for debris to come between the connector and the trigger body; correct?

A.      That is correct.

Deposition of Remington engineer Michael Keeney, *Williams v. Remington*.

30.     Derek Watkins, another Remington engineer, explained that this defect could lead to a dangerous situation:

> Q.      If the trigger doesn't return for whatever reason to full engagement. . . , that is not safe; would you agree with me? Because the gun is now more susceptible --
>
> A.      It is more—it is more sensitive, yes; it is more sensitive.
>
> Q.      It is more sensitive to forces that would jar the rifle in such a way for that engagement, basically, for the trigger no longer to be underneath the sear and the gun to discharge?
>
> A.      Yes.

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington*.

31.     James Ronkainen, another Remington engineer, also admits that failure of the connector to properly engage leads to a dangerous condition:

> Q.      One common factor in a fire on safe-release and a theoretical firing on bolt-closure is that the connector is not in its appropriate condition — position; correct?
>
> A.      Yes.  It is unable to support the sear.

Deposition of Remington engineer James Ronkainen, *Williams v. Remington*.

32.     This dangerous condition caused Remington to embark on redesign efforts many times in the 1980's and 1990's. The goal of these efforts was to eliminate the defect:

> Q.      The goal while you were there was to — is to achieve a design that did not result in a fire on safety-release; is that correct?
>
> A.      The design was to eliminate any type of-- any type of debris or any type of firing from that standpoint.  Fire on bolt-closure, yeah, we did-- we definitely did not want that to happen.

PLAINTIFF'S ORIGINAL COMPLAINT                                                    PAGE 9

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington*.

33.     When Remington again contemplated a recall of the Model 700 rifle (and similar firearms) in the mid-nineties, Kenneth D. Green, Manager of Technical & Consumer Services, drafted a forthright warning letter to owners of Remington rifles, which included the following language (emphasis in original):

> "This safety notice is being sent to be sure you understand that if your Model 700, Model Seven or Model 40X rifle is loaded, the gun may accidentally fire when you move the safety from the "safe" position to the "fire" position, or when you close the bolt."

34.     Mr. Green sent the draft warning to Remington's Bob Lyman for approval.  Mr. Lyman did not approve the draft.  Instead, he wrote in the margin to the left of the above language, "Needs to be rewritten; too strong."  Mr. Lyman, likely speculating that the language would hurt sales or confirm Remington's knowledge of the defect, ensured that Remington's customers never received the warning.

35.     Remington's defective fire control also could have been redesigned to eliminate the harm or danger very inexpensively.  Several companies sell connectorless replacement triggers for the Model 700.  There is no valid engineering reason why the successfully utilized connectorless designs could not have been used by Remington in its Model 700 and 710.

36.     Remington has recently removed the connector for some of its Model 700 rifles with a newly designed trigger mechanism, the X-Mark Pro.  That design was completed in 2002, before the incident in question.  This safer design would have prevented the injuries to Mr. Bledsoe.  But Remington chose to continue installing its prior design.  Even Remington's President and CEO, Thomas L. Millner, agreed in his 2007 deposition that the X-Mark Pro is a safer design (Question: "Did [Remington] make a safer fire control with the X-Mark Pro?"  Answer: "Yes, I believe so.").

37.     Not only did Mr. Millner admit that the design is safer, he admits that the new design prevents the rifle from firing upon release of the safety (Question: "And this new design precludes [fire on safety release] from occurring, true?"  Answer: "True.").  Finally, he admits that the old design—the design placed into Mr. Bledsoe's rifle even after Remington had the new design—does not have safety features precluding fire on safety release (Question: "And that's the fire control that does not have the safety features that preclude the fire on safe release, true?"  Answer: "That's correct.").  Simply put, Remington's new design would have prevented this accident, and Remington knew it.  But Remington did not take action to include the new fire control in Mr. Bledsoe's rifle or even warn him regarding a known safety issue.  Remington still widely uses the old fire control today, knowingly subjecting users to the gravest of dangers.

38.     Jury verdicts and appellate court opinions provide a succinct account of Remington's long-standing knowledge of its defective fire control.  In *Lewy v. Remington,* the Eighth Circuit upheld a finding of punitive damages against Remington in 1985:

> We hold that there was sufficient evidence from which the jury could find that Remington knew the M700 was dangerous.  The following evidence was before the jury: complaints from customers and gunsmiths that the Model 700 would fire upon release of safety, some of these complaints dating back as far as the early 1970s (footnote text in opinion omitted); Remington's own internal documents show that complaints were received more than two years before the Lewy rifle was produced; Remington created a Product Safety Subcommittee to evaluate M700·complaints and on two occasions decided against recalling the M700; and Remington responded to every customer complaint with a form letter that stated that they were unable to duplicate the problem, that the customer must have inadvertently pulled the trigger and that Remington could not assume liability for the discharge.

> We believe that in viewing this evidence, and permissible inferences, in the light most favorable to the Lewys a jury could reasonably conclude that Remington was acting with conscious disregard for the safety of others.  Remington maintains that their actions in investigating and responding to customer complaints and in creating the Product Safety Subcommittee to study the customer complaints reflect their good faith and sincerity in dealing with the M700.  However, another permissible view to be drawn from all of this evidence may be that Remington was merely "gearing up" for a second round of litigation

similar to the litigation involving the M600 which resulted in the ultimate recall of the M600. Remington's Product Safety Subcommittee concluded that of approximately two million M700s held by the public about 20,000 of them may have a potential defect (footnote omitted). A recall was not pursued because of the relatively small number of rifles that may have the defective condition. *See, e.g., Kehm v. Proctor & Gamble Mfg. Co.,* 724 F.2d 613, 620 (8th Cir.1983) ("[I]n determining whether a manufacturer has a duty to warn, courts inquire whether the manufacturer knew that there were even a relatively few persons who could not use its product without serious injury, and whether a proper warning would have helped prevent harm to them."). Thus, the jury may have concluded that rather than suffer the expense of a recall, Remington would rather take their chances that the 20,000 potentially dangerous M700 rifles held by the public will not cause an accident. Such a view, if true, would certainly establish that Remington acted with conscious disregard for the safety of others.

39.     On March 24, 1992, The United States Court of Appeals, Ninth Circuit, affirmed a jury

verdict of $724,000 in a case alleging discharge on bolt closure. *Campbell v. Remington Arms*

*Co.*, 1992 WL 54928, *2 (C.A. 9 (Alaska) 1992) (unpublished opinion).

40.     On December 31, 1992, the Texas Supreme Court, in *Chapa v. Garcia*, 848 S.W.2d 667,

671-74 (Tex. 1992), specifically describes Remington's fire control as "defective":

Luis Chapa clearly established the relevance of and his need for the documents, by offering evidence demonstrating that the NBAR program had as its goal improvement of the defective fire control on the Model 700 and that Chapa faced a significant time gap in the record as to Remington's *knowledge* of the defect (footnote omitted). Included in Chapa's showing was:

> • a 1985 Remington memorandum describing the NBAR program as one to design a "replacement for the Model 700"

> • another Remington memorandum declaring that an improved fire control be installed in the Model 700 no later than October 1982 "to put us in a more secure position with respect to product liability"

> • a memorandum evidencing an increase of $130,000, in early 1981, in the research budget for development of an improved Model 700 fire control

> • proof of the abrupt discontinuation of further research into the fire-control system of the Model 700 after December 1981 coincident in time with the commencement of the NBAR program

- deposition testimony that models of new, improved fire controls had been designed and assembled as part of NBAR, that prototypes had been built and tested, and that the NBAR fire controls could be retrofitted to the Model 700.

- Remington's admission that the fire control alternatives under consideration in the NBAR program and those it claims were geared solely to the Model 700 "attempt to execute the same *idea* (simultaneous blocking of the sear and trigger)" (footnote omitted).

- Remington's concession that the fire-control system research adopted the name "NBAR" in "late 1980 or 1981," about the time of the substantial increase in research funds for the Model 700 fire-control system.

- Remington's admission that "NBAR components which are or have been under consideration include a ... different fire control."

- Statements by Remington that NBAR information has relevance to the relative safety of its models compared to its competitors and the possible need for warnings.

41.     Then, on May 7, 1994, a Texas jury rendered a verdict after Glenn Collins lost his foot to a Model 700 accidental discharge (Fire on Safety Release allegation).  Not only did the jury find that the fire control was defective, it also awarded $15,000,000 in exemplary damages.  The total verdict, which was in excess of $17 million, sent a clear message to Remington—past and *certainly* future use of the defective fire control is unacceptable.

42.     It is difficult to ascertain exactly how many times Remington has embarked on designing a new Model 700 fire control.  It clearly tried with the "NBAR" program, and it clearly tried on several occasions in the 1990's, and it clearly again tried beginning in approximately the year 2000.  By 1995, Remington openly acknowledged the need to "fix" the fire control.  As voluminous documents show, it decided to "[e]liminate 'Fire on Safety Release' malfunction."

43.     Before work continued on a new fire control, Remington's Fire Control Business Contract (January 27, 1995) outlined the project and foreshadowed its end:

> The goal is to provide a fire control that "feels" the same to our customers yet provides additional safeguards against **inadvertent or negligent discharges**.
>
> . . .
>
> The purpose of the redesign of the fire control is to reduce the number of parts required, lower cost and to add design characteristics that **enhance the safety attributes** of our firearms.

44.     The next paragraph, however, laments that safety "is not considered a highly marketable feature." The next full paragraph in the document speaks for itself. Under "<u>Financial Analysis</u>," appears this telling quote:

> This is where the rubber meets the road. Is this project worth doing? What are the minimum forecasts to insure profitability and does our pricing structure support these expected profits?

45.     The project to "enhance the safety attributes of our firearms" is only "worth doing" if Remington can "insure profitability." True to form, the M700 Improvements Program was cancelled on August 28, 1998.

46.     Remington has repeatedly made a clear economic choice against recalling the Model 700. But the Model 710 was to be a new rifle. In 1997, and against this sordid and costly fifty-year historical backdrop, Remington faced an important but easily answered question regarding the new low cost bolt-action rifle it intended for beginner users: What fire control should Remington use?

47.     Remington's answer was appropriately given in terms of exclusion—Not the M700 fire control:

> **<u>Project Description:</u>**
> A low cost bolt action rifle accommodating short and long action calibers; standard barrel lengths; synthetic and wood stocks; magazine box, reasonable grade trigger (not the M/700 fire control); accepts scope bases; optional adjustable sights; and Matthewe metal finish.

PLAINTIFF'S ORIGINAL COMPLAINT                                                        PAGE 14

48.     Derek Watkins designed a connectorless fire control based on the work performed during the cancelled M700 improvements program.  Discussing two of the designs from that program in his January 1998 presentation, Watkins indicates that one design (the "6-Bar") was sensitive to assembly procedures, and for another (the "4 x 4"), tolerance issues were identified with the safety and system return.  But Watkins concisely reports that "[t]he [newly designed] M710 fire control addresses all these issues, while adding features and reducing the part count even further."

49.     Once again, Remington had a new and safe design.  But the design began to meet its end during economic analysis.  From a February 1998 memo:

> Our impression of the designs is that they represent a great deal of potential. Some of the concepts deviate substantially from the processing capabilities at Ilion [New York], and therefore would require fairly substantial investments in capital and technical resources to implement.

50.     Though Remington documents clearly show that Watkins' design was favored ("The new concept barrel and fire control analysis was complete with excellent results"), project spending was put on hold in May 1998 "until economics and project is approved."  That approval never came.

51.     On August 25, 1998, Watkins' safe design was abandoned due to an "estimated cost increase."  Motivated once again by the prospect of saving money and increasing its profit margin, Remington decided to pull the unsafe Model 700 fire control off the shelf and use it in the new Model 710 to "eliminate development cost and time."  This is the same fire control that it had specifically rejected for the new rifle 18 months earlier.

52.     As Remington began its internal testing of the new Model 710 (with the defective and dangerous Model 700 fire control installed), it is important to note that Remington, knowing the history of the design, even warned its Model 710 testers of the possibility of inadvertent

discharge:

> For each of the four rounds in the magazine the tester will close the bolt "smartly"—(i.e. as quickly as practical)—and be prepared for the rifle to inadvertently follow down or fire.

53.     No such warning is provided to customers that purchase the Model 710.  And the Model 710 *did* fire on bolt closure and on safety release during testing.

54.     Remington Consumer Team Meeting minutes from December 13, 2001 reveal that Remington actually planned for personal injuries of its customers as a result of inadvertent discharge from Model 710 rifles:

> - **Safety/Injury Calls and the Model 710 - Ken**
>   If a consumer calls with a safety concern, (ie FSR, fires when closed, personal injury or property damage, etc), these calls AND firearms go to Dennis or Fred

55.     Predictably, Remington began receiving reports of injury and accidental discharge from a fire control almost identical to the Model 700 fire control.

56.     Remington is defiant in its reluctance to recall or stop using its fire control, a product that it knows is dangerous and that will kill or injury again, through no fault of the user.  On June 1, 1994, Remington's Ken Green estimated that a "replacement campaign" would cost approximately $22,700,000.  This cost estimate did "not include any new equipment necessary to manufacture the [new] trigger assemblies."  Remington again elected against a recall.

57.     The following note from a Remington trainee reveals Remington's defiance:

> "**SAMMI-Shooting Arms Ammunition Manufacturers Institute.**  This is our governing regulator -- not the federal government.  Federal government has no say in anything.  We issue recalls -- not the government.  SAMMI makes regulations for this -- not the federal government.  Ken Weadon is on the board [of directors] of SAMMI.  He was a vice president for Remington."

58.     These are contemporaneous notes taken by someone in training to work for Remington. So confident is Remington that no one or no organization can mandate a recall of its dangerous

product, the company actually brags about it to new hires.  This is improper.

VII.

DAMAGES AND JURY DEMAND

59.    As a result of Defendant's acts and/or omissions, Plaintiff Charles Bledsoe has experienced physical pain, suffering and disfigurement in the past and in all reasonable probability will sustain physical pain, suffering and disfigurement in the future.

60.    Plaintiff has suffered impairment, incapacity and disability in the past.  He will suffer impairment, incapacity and disability in the future.

61.    Plaintiff has incurred other pecuniary damages in the past and in reasonable probability will continue to suffer pecuniary loss in the future, including loss of earnings, benefits and earning capacity and the ability to conduct household tasks and other aspects of personal care and service.

62.    Plaintiff has suffered mental anguish in the past and in all reasonable probability will sustain mental anguish in the future.

63.    Plaintiff has incurred reasonable and necessary medical expenses in the past and based upon reasonable medical probability will incur reasonable and necessary medical expenses in the future.

64.    Plaintiff, as described above, requests that Remington be assessed exemplary or punitive damages.

65.    The above and foregoing acts and/or omissions of Defendant have caused actual damages to Plaintiff in an amount in excess of the minimum jurisdictional limits of this Court.

66.    Plaintiff demands a jury.

WHEREFORE, Plaintiff prays judgment against Defendant as follows:

1. For all monetary damages allowed under law and described, without limitation, above, plus interest;

2. For costs of suit; and

3. For such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

Jeffrey W. Hightower, Jr.[1]
Texas SBN:  00793951

**HIGHTOWER LAW FIRM**
9400 North Central Expressway
Suite 1207
Dallas, Texas  75231
Phone:  214.580.9800
Fax:  214.580.9804
E-mail:  jeff@hightowerlawoffice.com

**COUNSEL FOR PLAINTIFF**

---

[1] Mr. Hightower is admitted to practice in the United States District Court for the Northern District of Texas.

PLAINTIFF'S ORIGINAL COMPLAINT

3-09CV0734-L

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Charles P. Bledsoe

**DEFENDANTS**

Remington Arms Company, Inc.

**(b)** County of Residence of First Listed Plaintiff  Sumter County, Georgia
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Rockingham County, North Carolina
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jeffrey W. Hightower, Jr.  Hightower Law Firm  9400 N Central Expressway

Attorneys (If Known)

Dale Wills   Swanson Martin & Bell  Chicago

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

Dal TX 75231

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

RECEIVED
2009
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☒ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN  (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 USC 1391

Brief description of cause: Products liability— Defective rifle caused personal injury

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  April 22, 2009

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____